# EXHIBIT A

1  Dennis Holahan, Esq. (CSB: 057324)
2  Michael K. Zweig, Of Counsel (CSB: 078704)
   LAW OFFICE OF DENNIS HOLAHAN
3  2049 Century Park East, Suite 3180
   Los Angeles, California 90067
4  Tel: (310) 286-3344
5  Fax: (310) 286-2299
6  Attorneys for Plaintiff Christine Wolf

**FILED**
LOS ANGELES SUPERIOR COURT

JUL 25 2008

JOHN A. CLARKE, CLERK
BY MARY GARCIA, DEPUTY

7            SUPERIOR COURT OF THE STATE OF CALIFORNIA

8              COUNTY OF LOS ANGELES (CENTRAL DISTRICT)

9

10

11  CHRISTINE WOLF,                          CASE NO.    BC395173

12              Plaintiff,

13  v.                                       **COMPLAINT FOR:**

14  LORING WARD INC. F/K/A ASSANTE           1. **Breach of Fiduciary Duty**
    BUSINESS MANAGEMENT INC.,
15  ASSANTE CORPORATION, MARTIN              2. **Fraud**
    WEINBERG, AND ROBERT PHILPOTT,
16  and DOES 1 through 100, inclusive,       3. **Negligent Misrepresentation**

17              Defendants.                  4. **Negligence**

18                                           5. **Breach of Contract**

19                                           **DEMAND FOR TRIAL BY JURY**

20

21

22

23

24

25

26

27

28

---
                                    1
         COMPLAINT FOR BREACH OF FIDUCIARY DUTY, FRAUD, et al.

ORIGINAL

D 62 U. stin Michael L.

CIT/CASE: BC395173 LEA/DEFH:
RECEIPT #: 08HK07B057B020
DATE PAID: 07/25/08 02:15:42 PM
PAYMENT: $201.00    B310
RECEIVED:
    CHECK:
    CASH:
    CHANGE:
    CARD:
    $201.00
    $201.00

## COMPLAINT

Plaintiff Christine Wolf files this Complaint against Defendants Loring Ward Inc. f/k/a Assante Business Management Inc. ("Assante Business Management") (collectively "Loring Ward"), Assante Corporation ("Assante"), Martin Weinberg ("Weinberg"), and Robert Philpott ("Philpott"), and alleges as follows:

## PARTIES

1.     Plaintiff Christine Wolf ("Plaintiff" or "Ms. Wolf") is an individual who is a resident of Greenwich, Connecticut.

2.     Defendant Loring Ward is a California corporation with its principal place of business in Los Angeles, California. It is registered to do business and at all times relevant hereto transacted business in Los Angeles, California.

3.     Defendant Assante is a Canadian corporation with its principal place of business in Toronto, Ontario, Canada. At all times relevant hereto, Assante transacted business in Los Angeles, California through Loring Ward, which, until November 2003, was a wholly-owned subsidiary of Assante. At that time, Assante spun off Loring Ward to its shareholders and, as part of the same transaction, all of the shares of Assante were acquired by CI Fund Management, Inc., a publicly-held Canadian corporation.

4.     Defendant Martin Weinberg is an individual domiciled in Winnipeg, Manitoba, Canada.

5.     Defendant Robert Philpott is an individual domiciled in Agoura Hills, California.

6.     This Court has personal jurisdiction over all Defendants, who are either citizens of California, maintain their principal places of business in California, actively transact, or at all times relevant to this action, transacted business in California, or have minimum contacts with California in connection with the events giving rise to this action.

7.     Venue is proper in this Court because some or all of the actions and conduct of Defendants upon which Plaintiff Wolf's claims are based occurred in Los Angeles County.

## STATEMENT OF FACTS

### Background Facts

8.  Plaintiff Christine Wolf previously filed these claims in United States District Court, Central District of California, in the action styled *Christine Wolf v. Loring Ward International Ltd et al* Case No: CV 05-3535 PSG (RZx) ("Federal Action") on May 11, 2005. The Federal Action was dismissed for lack of jurisdiction on April 4, 2008. That dismissal is currently on appeal to the Ninth Circuit Court of Appeals. This action (the "State Court Action") is therefore filed as a "protective action" to preserve Ms. Wolf's claims if the appeal to the Ninth Circuit is unsuccessful.

9.  Plaintiff Christine Wolf was married to Dick Wolf, the creator and producer of the television series *Law & Order*, in 1983, and was legally separated from Mr. Wolf in 2003. During the Wolfs' marriage, Mr. Wolf created three television series which, at all times relevant to this action, were being aired on network television: the original *Law & Order*; *Law & Order: Special Victims Unit*; and *Law & Order: Criminal Intent*. Episodes of two of those series—the original *Law & Order*, and *Law & Order: Special Victims Unit*—were, at all times relevant to this action, also being aired on off-network (or cable) television. The three *Law & Order* series are hereinafter referred to collectively as the "*Law & Order* Franchise."

10.  This is a case in which Robert Philpott – a business manager and CPA who had served in that capacity for many years for Mr. and Ms. Wolf -- and Martin Weinberg, the CEO of Assante, breached their fiduciary duties to Plaintiff, and defrauded Plaintiff, by deliberately concealing from her the fact that the forensic accounting analysis, which formed the basis for what was represented to Plaintiff as Weinberg's fair and neutral recommendation for the division of the Wolfs' marital assets, actually had been prepared by a forensic accountant retained by Mr. Wolf's divorce lawyer, Joseph Kibre. Ms. Wolf trusted Weinberg to provide an accurate and unbiased financial analysis when Weinberg suggested that she rely upon him and Assante as unbiased advisers to her and Mr. Wolf with respect to the terms of a potential marital property division between the couple. Ms. Wolf also trusted that Philpott – as the long-time CPA and business manager for both Mr. and Mrs. Wolf – would provide

1    Weinberg with complete and unbiased financial information about the Wolfs' marital assets,

2    which information would form the basis for Weinberg's recommendations.

3        11.    In fact, in formulating and recommending to Plaintiff first a Memorandum of

4    Agreement (the "MOA") concerning the dissolution of the Wolfs' marriage, and a division of

5    the assets of their marital community, and ultimately the Marital Settlement Agreement (the

6    "MSA") that was entered as a final judgment in the Wolfs' separation proceedings, and in

7    counseling Ms. Wolf to accept those agreements, Defendants committed the following acts,

8    and willfully concealed those acts from Plaintiff:

9        (a)    Instead of transmitting to Weinberg financial materials that he had

10    prepared himself as the business manager and CPA for the Wolfs, Philpott in or about

11    September, 2002 transmitted financial materials regarding the Wolfs to the forensic

12    accounting firm of Cohen, Miskei & Mowrey ("CMM"). Unbeknownst to Ms. Wolf, CMM

13    earlier had been retained by Joseph Kibre, Mr. Wolf's divorce lawyer, to work on behalf of

14    Mr. Wolf in connection with a potential divorce from Ms. Wolf. Plaintiff is informed and

15    believes, and thereon alleges, that the work done by CMM in September, 2002 was an update

16    and/or extension of the work done earlier in 2002 by CMM on behalf of Mr. Wolf;

17        (b)    CMM, at the instruction of Kibre and with Philpott's assistance, prepared

18    various financial analyses that failed to assign any value to significant community assets

19    (other than as expressly contracted for by Mr. Wolf in 2001), including but not limited to: (1)

20    the *Law & Order* Franchise of which Mr. Wolf was the creator and producer; (2) the three

21    "*Law & Order*" series then being televised on a first-run basis on network television and/or

22    off-network, all of which Mr. Wolf created and produced; (3) the syndication value of the

23    "*Law & Order*" episodes of all three series created during the marriage; and (4) the good will

24    of Wolf Films, Inc. (Mr. Wolf's wholly-owned corporation);

25        (c)    Philpott thereafter transmitted the CMM analyses to Weinberg with the

26    express instruction that Weinberg not disclose to Ms. Wolf that the analyses had been

27    prepared by a forensic accounting firm that was not neutral or unbiased but, rather, had been

28    retained by Mr. Wolf's divorce lawyer;

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, FRAUD, et al.

(d)    Without disclosing to Ms. Wolf that he had done so, Weinberg used the biased CMM analyses as the basis for a "Wealth Planning Special Analysis" and a Proposed Term Sheet that Weinberg ultimately presented to Ms. Wolf in November, 2002 as his own unbiased work, and as his recommendation for a division of the community property of the Wolfs' marital estate;

(e)    After preparing a draft term sheet based on the biased CMM analyses, Weinberg sought comments thereon from Philpott and Mr. Wolf's transactional entertainment lawyer and Mr. Wolf's divorce lawyer prior to submitting the document to Ms. Wolf, all without Ms. Wolf's knowledge;

(f)    Weinberg then sent a second draft term sheet to Philpott containing a significant change adverse to Ms. Wolf, again without Ms. Wolf's knowledge;

(g)    Joseph Kibre, Mr. Wolf's divorce lawyer, then, unbeknownst to Ms. Wolf, redrafted Weinberg's term sheet, which Philpott sent to Weinberg. It is this revised term sheet -- which Mr. Wolf's divorce attorney Kibre drafted -- that Weinberg, in November, 2002, presented to Christine Wolf as the end product of his own, supposedly neutral, analysis and investigation.

12.    Had Defendants disclosed the foregoing facts to Plaintiff, she would have known that the purportedly neutral analysis and recommendation from Defendant Weinberg was not neutral at all but, rather, was the deliberately biased product of an orchestrated effort masterminded by Philpott and executed by Weinberg in concert with Mr. Wolf's divorce lawyer. Had Defendants not succeeded in concealing these facts from Plaintiff, she would not have trusted and relied on Defendants' purported neutrality and, instead, would have retained her own forensic accounting expert and/or valuation expert to identify and value the assets of the marital estate, and would have learned of the future income to be generated by, or likely to be generated by, those assets.

13.    During the purportedly neutral process facilitated by Defendant Weinberg, Weinberg represented to Ms. Wolf, directly or through her counsel, William Beslow, that the following were true: (1) that Mr. Wolf, pursuant to his then-current contract with Studios

1  USA (the "2001 Overall Term Deal"), had negotiated successfully for a $50 million
2  "advance" in connection with the *Law & Order* Franchise, $42 million of which already had
3  been paid, and $8 million of which remained to be paid; (2) that Weinberg and Assante had
4  analyzed the future income to be received by Mr. Wolf and Wolf Films, Inc, and that, based
5  on Weinberg's and Assante's projections, due diligence and analysis, Mr. Wolf would be paid
6  nothing more under his 2001 Overall Term Deal beyond the $50 million; (3) that, under
7  Weinberg's analysis and recommendation, Ms. Wolf would share fully in the additional $8
8  million to be paid under the 2001 Overall Term Deal; (4) that, if Ms. Wolf were to retain her
9  own expert to value the future income to be generated by the assets of the marital estate, that
10 act would constitute a breach of the agreement she had made with Weinberg, and would
11 propel her into years of nightmarish litigation with Mr. Wolf; and (5) that it would be
12 senseless in any event for Ms. Wolf to thrust herself into nightmarish litigation adverse to Mr.
13 Wolf because, during the term of the 2001 Overall Term Deal (January 1, 2001 to August 31,
14 2006) Mr. Wolf would be paid nothing more than the $50 million, so that she would be
15 fighting for something that did not exist.

16      14.    Plaintiff is informed and believes, and thereon alleges, that the foregoing
17 representations were false, and were made by Weinberg without any basis for believing them
18 to be true because, at the time Weinberg made these representations, neither Weinberg nor
19 Assante had done the analysis that Weinberg represented he had done. Weinberg therefore
20 had no basis to make the statements he made, other than the CMM analysis, which Weinberg
21 knew or should have known did not take into account significant community assets, including
22 most importantly, the value of the *Law & Order* Franchise. Specifically, Weinberg and
23 Assante had taken no steps to analyze the most significant assets of the Wolfs' marital estate,
24 including the value of the *Law & Order* Franchise, or the three *Law & Order* series.

25      15.    Separate and apart from Defendants' concealment of all of the foregoing acts
26 from Plaintiff, and the foregoing misrepresentations, Defendants failed to investigate properly
27 and thoroughly the full extent of the Wolfs' community assets and their value, and were
28 negligent in performing their duties as Ms. Wolf's business managers and financial

1  counselors, to such an extent that they thereby breached their agreement with, and their

2  fiduciary duties to, Ms. Wolf.

3      16.    Plaintiff is informed and believes, and thereon alleges, that Defendants knew or

4  should have known that the three *Law & Order* series created during the Wolfs' marriage had

5  significant value beyond the $50 million payment to Mr. Wolf under his 2001 Overall Term

6  Deal. At a minimum, Defendants knew or should have known the following:

7          (a)    The episodes of the three *Law & Order* series created during the

8  marriage had significant syndication value (*i.e.,* off network or "back end" value) for an

9  indefinite period of time into the future. This was true for a number of reasons, including the

10 fact that the *Law & Order* episodes are highly syndicatable, as each episode is a self-

11 contained, classic crime drama that does not require the viewer to have any prior knowledge

12 of the characters or of an ongoing story line. In addition, as of the time of the events that are

13 the subject of this action, the original *Law & Order* series had been syndicated three times,

14 and had accomplished the highly unusual feat of having been syndicated on each of those

15 three occasions for a higher per episode price than for the prior syndication. Moreover, as of

16 2001, *Law & Order: Special Victims Unit* had been syndicated for an unprecedented $1.3

17 million per episode. In view of the syndication history of the original *Law & Order* and *Law*

18 *& Order: Special Victims Unit*, there was no question that *Law & Order: Criminal Intent*

19 would also be sold into syndication at a significant per episode price. Nor was there any

20 question that the other two *Law & Order* series would continue to be syndicated in the future

21 when the then-existing syndication contracts expired;

22         (b)    During the period in which the MOA and the MSA were negotiated and

23 entered into, each of the three *Law & Order* series had achieved enormous popularity. By

24 way of example, the original *Law & Order* series had ended the 2001-2002 season—its 12th

25 —with its highest audience ratings ever, which was a accomplishment unprecedented in

26 television history. *Law & Order: Special Victims Unit* had ended the 2001-2002 season, the

27 series 3rd season, with its highest ratings ever, and *Law & Order: Criminal Intent* had

28 concluded its first season with very high audience ratings as well. The *Law & Order*

1 Franchise in the 2002-2003 season again enjoyed unprecedented success. By way of

2 example, all three series "won" their timeslots, all three were in the top 20 rated series for the

3 season, and the original *Law & Order* completed its 300th episode;

4         (c)    As of the 2002-2003 time period at issue in this action, *Law & Order*

5 was routinely characterized by Mr. Wolf and other television industry professionals as a

6 "brand," with the *Law & Order: Special Victims Unit* and *Law & Order: Criminal Intent*

7 series viewed as an "extension of the brand"; and

8         (d)    The *Law & Order* brand and franchise had become extremely important

9 to the NBC network, with the three series accounting for a significant percentage of the

10 network's gross profits as of 2002-2003.

11         17.    Ms. Wolf is entitled to compensation for the loss of her share of very substantial

12 revenues from the community estate as a result of Defendants' acts. As Ms. Wolf's

13 fiduciaries, Defendants should have advised her openly and honestly about all of the assets of

14 the marital estate, and the potential magnitude of, and her entitlement to, her fair share of all

15 of those assets. Specifically, Defendants should have advised her that: (i) Weinberg's

16 analysis and recommendations were based on forensic accounting documents prepared by a

17 firm retained by Mr. Wolf's divorce lawyer to represent the interests of Mr. Wolf; (ii)

18 Weinberg's recommended term sheet had been redrafted by Mr. Wolf's divorce lawyer, based

19 on input from Mr. Wolf's transactional entertainment lawyer; and (iii) as a result, Ms. Wolf

20 needed to retain her own independent advisors to identify and value all of the assets of the

21 marital estate, and to assess her fair share of that estate.

22         18.    Instead, Defendants willfully concealed from Plaintiff that Weinberg's analyses

23 and recommendations were based on a forensic accounting exercise commissioned by Mr.

24 Wolf's divorce lawyer, and a rewrite of the term sheet by that lawyer, and induced her to rely

25 on analyses and recommendations that, by design, were biased toward Mr. Wolf, and which

26 did not identify or value significant assets of the marital estate. Ultimately Defendants

27 advised Plaintiff to accept much less than what they knew, or should have known, to be her

28 fair share of the marital estate, all in order to benefit Mr. Wolf and themselves financially.

## Defendants Serve as Ms. Wolf's Business Managers

## and Financial Advisors

19.     Philpott began acting as business manager and CPA for both Mr. and Ms. Wolf in October 1994, when he worked for the firm then known as Philpott, Bills & Stoll. That firm merged with Assante in 1998. After the merger, Philpott, through an Assante entity called Assante Business Management, continued acting as the Wolfs' business manager and CPA. Philpott and Assante provided business management and CPA services to the Wolfs in connection with their personal finances. Philpott and Assante, *inter alia*, paid bills, prepared taxes, developed budgets, oversaw risk management and investments, and provided general financial advice. Not surprisingly, in light of his betrayal of Ms. Wolf's interests for the financial benefit of Mr. Wolf, Philpott continues to provide these services to Mr. Wolf today.

## Defendants Contract with Ms. Wolf to Advise Her and Propose A

## Division of Marital Property

20.     In August 2002, Ms. Wolf informed her husband that, because of his consistent neglect of his family and his infidelity to her, she wished to end their marriage. At the end of that month, Weinberg, the chairman of Assante, suggested to Ms. Wolf in a telephone conversation that he was uniquely situated to act as a neutral adviser to both Mr. and Ms. Wolf regarding the assets of the community estate, and a potential division of their marital assets. According to Weinberg, this would permit the parties to arrive at terms for a fair and equitable marital property settlement on an amicable basis, and thus avoid litigation and the substantial legal costs which otherwise would ensue. Ms. Wolf was encouraged by Weinberg to rely on him, with input from Philpott and – based on the work Philpott had done historically for the Wolfs-- to value the Wolfs' community assets and to propose terms for an equitable division of those assets. Weinberg told Ms. Wolf that an attorney had successfully served in a similar role as a neutral adviser during separation proceedings between Weinberg and his former wife.

21.     In a mid-September 2002 telephone conversation, Weinberg specifically told Ms. Wolf that Assante would prepare an analysis of Mr. and Ms. Wolf's financial position,

9

1  and that he would then propose a "term sheet" for a proposed property settlement agreement
2  between Mr. and Ms. Wolf. Weinberg also told Ms. Wolf that he would get from Philpott the
3  documentation he required to do a complete analysis of the Wolf marital estate. Ultimately,
4  Weinberg said that if he were to undertake the role he had proposed, he would expect both
5  Mr. and Ms. Wolf to commit to make a good-faith effort to adopt his recommendations.

6       22.    Based on Weinberg's representations, Ms. Wolf authorized Weinberg, Assante,
7  and Assante Business Management to analyze the Wolfs' financial condition, and then to
8  propose terms to both Mr. and Mrs. Wolf for a fair and equitable division of their marital
9  property. As the Wolfs' long-standing business managers and financial advisors, Assante and
10 Assante Business Management had, or should have had, complete knowledge of Mr. and
11 Ms. Wolf's financial condition. Ms. Wolf trusted Assante's, Assante Business Management's,
12 Weinberg's, and Philpott's expertise and bona fides, and she had no reason to believe that
13 Assante and Assante Business Management would be less than even-handed and truly neutral
14 in discharging their undertaking, just as Weinberg had promised. Ms. Wolf agreed to make a
15 good-faith effort to abide by the recommendations that would eventually be presented by
16 Assante, all in the belief that the recommendations would be objective, neutral, informed, and
17 fair. Based on this belief, Ms. Wolf severely limited her divorce attorney's involvement in the
18 process Weinberg had proposed.

19      23.    Shortly after accepting Weinberg's offer, Ms. Wolf was told that Mr. Wolf also
20 had agreed to the proposed arrangement. At no point did Weinberg, Philpott, or anyone else
21 at Assante or Assante Business Management inform Ms. Wolf that Weinberg or Assante
22 intended to retain or rely upon anyone or any entity retained by Mr. Wolf's divorce lawyer to
23 represent the interests of Mr. Wolf to assist them in preparing their analysis of the Wolfs'
24 financial position and the "term sheet." Moreover, in a September 2002 telephone
25 conversation, Weinberg specifically told Ms. Wolf that Assante would prepare the financial
26 analysis and "term sheet."

27      24.    Unbeknownst to Ms. Wolf, at some point in 2002, Mr. Wolf retained a divorce
28 lawyer named Joseph Kibre, and Mr. Kibre retained the forensic accounting firm CMM to

1  perform work on behalf of Mr. Wolf. Also unbeknownst to Ms. Wolf, Mr. Kibre retained

2  CMM in the Summer or Fall of 2002 to perform forensic accounting work, with the assistance

3  of Defendant Philpott, in connection with the preparation of the purportedly neutral analysis

4  of the Wolfs' financial condition that Defendant Weinberg told Plaintiff that he, Assante, and

5  Assante Business Management would perform. In fact, Weinberg, Assante, and Assante

6  Business Management used the work of Mr. Wolf's accounting firm, CMM, as the basis for

7  their financial analysis and "term sheet," but at no point did Defendants disclose to Ms. Wolf

8  that CMM had been retained by Mr. Wolf's divorce lawyer to represent his interests. Indeed,

9  Defendants willfully concealed this information from Ms. Wolf.

10       25.    Ms. Wolf did not learn that CMM had been hired by Mr. Wolf's divorce lawyer

11  until on or about February 5, 2004. Had Ms. Wolf known of CMM's role and affiliation

12  earlier, she would have known to distrust the purported accuracy, thoroughness, and

13  objectivity of the report and "term sheet" prepared in whole or in part on the basis of analyses

14  by an accounting firm hired by Mr. Wolf's divorce attorney. Had Ms. Wolf known that

15  Mr. Wolf's divorce attorney had retained Mr. Wolf's accounting firm to prepare the financial

16  analyses which would form the basis for Mr. Weinberg's work and recommendation, she

17  would have known it to be essential that she engage her own independent forensic accounting

18  firm, along with experts capable of identifying and valuing all assets of the marital estate,

19  particularly the value of the *Law and Order* Franchise, to review the CMM and Assante work,

20  and to prepare an independent analysis. But Assante, Assante Business Management,

21  Weinberg, and Philpott, in order to induce Plaintiff to rely on Mr. Weinberg's analyses and

22  recommendations, willfully concealed the foregoing facts from Plaintiff.

23       26.    As a result, Ms. Wolf continued to rely in good faith on Defendants to

24  undertake a full investigation and analysis, and to make a full disclosure of all relevant

25  information and documents as to Mr. Wolf's financial condition and the assets of the marital

26  estate -- including the value of any rights that the Wolfs had or were reasonably likely to have

27  arising out of or relating to Mr. Wolf's status as creator and producer of the three *Law &*

28  *Order* series, and the *Law & Order* Franchise.

27.   In fact, the financial analyses ultimately presented to Ms. Wolf by Weinberg as purportedly fair and accurate reports detailing the assets of the Wolfs' community estate were neither fair nor accurate respecting Ms. Wolf's interests, as they failed to value significant assets of the marital estate.

28.   Rather than providing a fair, accurate, and objective report detailing the community estate's assets, as promised, Weinberg and Assante instead based their financial analyses and recommendations on work performed by Mr. Wolf's attorneys, and the CMM firm retained by Mr. Wolf's divorce lawyer, all for the financial benefit of Mr. Wolf, and for the financial benefit of the Defendants themselves, since Defendants were taking all these secretive actions out of self interest as they sought to retain their prized client and ever growing golden goose, Mr. Wolf, at the expense of their financially fading client, Ms. Wolf. But Ms. Wolf believed Weinberg when he promised to be fair, accurate, and objective, and she therefore relied on Assante's financial analyses and recommendations to her detriment.

29.   In the meantime, in December 2002, Weinberg continued to urge that Ms. Wolf confine her own divorce lawyer to a limited role, and specifically urged that she not retain her own forensic accountant because: (1) that would propel her into years of nightmarish litigation with Mr. Wolf; (2) she would get less out of litigation than she would get from his proposed division of the Wolf's marital property; and (3) there was nothing worth fighting for, because his proposed recommendations took into account the $50 million being paid to Mr. Wolf under his 2001 Overall Term Deal, which Weinberg represented to be all monies that Mr. Wolf would be paid during the term of that deal (*i.e.*, through August 31, 2006). Weinberg told Ms. Wolf, directly or through her counsel William Beslow, that the point of having him serve as an unbiased adviser during the negotiation of a division of the Wolf's marital property was to render such expenses and time-consuming activities unnecessary. Again, Ms. Wolf trusted Weinberg and believed in his, Philpott's, Assante's, and Assante Business Management's fairness and objectivity.

30.   As a result, while Ms. Wolf retained Mr. Beslow to negotiate some revisions to the term sheets and proposed agreements, she purposefully limited his involvement in any

1  examination of Assante's and Assante Business Management's financial analyses and

2  recommendations, and thus declined to hire an independent accounting or financial advisory

3  firm to review them. Ms. Wolf thus relied on Weinberg's, Assante's, and Assante Business

4  Management's promises and representations in accepting the financial analyses they provided

5  to her as fair, objective, and accurate, and in moving forward toward agreement on a division

6  of the Wolfs' marital property on that basis.

7          **Ms. Wolf Relies on Defendants' Biased "Term Sheet"**

8          31.    In early November 2002, Ms. Wolf learned that Mr. Wolf was insisting that an

9  agreement as to their community property and other issues be executed by Thanksgiving of

10  that year. That seemed to her impossible, particularly because Ms. Wolf had not yet received

11  the "term sheet" containing Weinberg's recommendations. (Later, and to Ms. Wolf's great

12  surprise, she learned, on or about February 5, 2004, that the reason for the delay was that

13  Weinberg had in fact prepared and forwarded a "term sheet" to Mr. Wolf's divorce lawyer,

14  Joseph Kibre, in October 2002, which Mr. Kibre in turn had re-drafted and forwarded to

15  Philpott for transmittal to Weinberg. Mr. Kibre's "term sheet" is the version that Weinberg

16  ultimately forwarded to Ms. Wolf's counsel in mid-November 2002, as if it were Weinberg's

17  or Assante's own work product. Both Philpott and Weinberg failed to disclose to Ms. Wolf

18  that Mr. Kibre had redrafted the term sheet, and that it was Kibre's term sheet that had been

19  presented to her, not Weinberg's or Assante's.)

20          32.    Thus, unbeknownst to Ms. Wolf at the time, Weinberg had submitted his

21  proposed term sheet to Philpott, to Mr. Wolf's divorce lawyer, and to Mr. Wolf's transactional

22  entertainment lawyer for their review, had allowed Mr. Wolf's divorce lawyer to rewrite the

23  term sheet, and only then presented the term sheet to Ms. Wolf as his own work. As a result,

24  Weinberg's purportedly neutral recommendation was, in actuality, the product of an analysis

25  performed by Mr. Wolf's forensic accountant. The purported neutrality of Weinberg, Philpott,

26  Assante, and Assante Business Management as advisors was thus a complete deception from

27  the outset, all without Ms. Wolf's knowledge.

28

33.     The "term sheet" provided several recommendations concerning the Wolfs' marital property, including recommendations for spousal support, child support, cash payments by Mr. Wolf to Ms. Wolf over a multi-year period, home ownership, and retention of property in each spouse's name by that spouse. The "term sheet," like Weinberg's financial analyses, placed a "cap" on the total dollar amount of Mr. Wolf's future income to which Ms. Wolf would be entitled. It specifically proposed that Ms. Wolf receive, exclusive of spousal and child support, a distribution of cash and property having an aggregate value of approximately $15 million, and that Mr. Wolf receive the balance of the assets in the marital community.

34.     Significantly, the "term sheet" states that the recommendations it contained were based on Assante's and Assante Business Management's financial analysis of the parties' assets, and the work of forensic accountants; it does not disclose that those forensic accountants were retained by Mr. Wolf's divorce lawyer to represent Mr. Wolf's interests. In light of this presentation of the "term sheet" as based on objective data, Ms. Wolf had no reason to believe that the underlying analysis and accounting work were compromised by bias against her, and she therefore believed that the terms proposed took into account any revenues to which she was entitled as a result of the *Law & Order* Franchise and episodes of all three *Law & Order* series created during the Wolf's marriage.

35.     During the discussions about the "term sheet," Weinberg assured Ms. Wolf, directly or through her counsel Mr. Beslow that Assante had properly investigated and accounted for Mr. Wolf's future revenues attributable to any community assets.

36.     Specifically, during the period November, 2002 through January, 2003, Weinberg represented repeatedly to Beslow: (1) that as part of Assante's due diligence in support of their representations regarding projected revenues for Mr. Wolf, Weinberg and Assante had analyzed the projected income of Mr. Wolf and Wolf Films through the term of Mr. Wolf's 2001 Overall Term Deal; (2) that Mr. Wolf had negotiated for a $50 million payment pursuant to the 2001 Overall Term Deal, $42 million of which already had been paid, and $8 million of which remained to be paid; (3) that Weinberg's and Assante's

14

1 projections established that Mr. Wolf during the term of the 2001 Overall Term Deal was
2 going to be paid nothing more than the $50 million; (4) that there was no possibility within
3 the foreseeable future of Mr. Wolf or Wolf Films being paid a major amount of money
4 beyond the $50 million; (5) that Assante was attributing zero value to Mr. Wolf's future
5 income during the term of the 2001 Overall Term Deal beyond the $50 million, because the
6 $50 million took into account all income to be earned by Mr. Wolf during that period; (6) that
7 Ms. Wolf and Mr. Beslow should not even think of retaining their own independent experts to
8 value Mr. Wolf's or Wolf Films' future income, as doing so would propel Ms. Wolf into years
9 of nightmarish litigation with Mr. Wolf during which Mr. Wolf would ruin Ms. Wolf's life
10 and refuse to see their children; (7) that Ms. Wolf had promised going into the process that
11 she would not retain outside experts to prepare a financial analysis of the marital estate, and
12 that doing so would be a breach of her agreement with Weinberg; and (8) that it would be
13 pointless for Ms. Wolf to thrust herself into nightmarish litigation adverse to Mr. Wolf in the
14 hopes of recovering something beyond her share of the $50 million, because she would be
15 fighting for something that did not exist.

16      37.    On the basis of Weinberg's representations, Ms. Wolf did what she had
17 promised to do: she trustingly adopted the "term sheet" that she believed to be the good-faith
18 and unbiased recommendation of Weinberg and Assante, based on their purportedly thorough
19 analysis of the marital estate, and she pursued negotiation of the fine points of the deal
20 operating under the erroneous assumption that the financials were fundamentally sound and
21 objective, which was far from true.

22      38.    Relying on Assante's, Assante Business Management's, Weinberg's, and
23 Philpott's represented neutrality as business managers and financial advisors for both her and
24 her husband, and therefore on the integrity of both their oral representations and the financial
25 analyses and recommendation prepared by Assante, Ms. Wolf negotiated for only a small
26 number of adjustments in the November 2002 "term sheet." She ultimately agreed to terms
27 that essentially reflected those of the "term sheet" in the form of the MOA with Mr. Wolf on
28 March 25, 2003.

39.   The Wolfs' respective counsel thereafter began discussions with a view towards transforming the MOA into a Marital Settlement Agreement ("MSA"). Although the process took several months because of disputes about certain provisions, Ms. Wolf ultimately signed the MSA on August 13, 2003, and said MSA was later entered as a final judgment in the Wolfs' separation case. As of that date, Ms. Wolf still believed that she had been given good-faith, informed, and impartial recommendations by Assante, Assante Business Management, Weinberg, and Philpott.

40.   Ms. Wolf's good-faith reliance upon Defendants' professionalism, competence, and purported neutrality soon proved to have been misplaced. On September 5, 2003, only three weeks after she signed the MSA, Ms. Wolf learned of an article about Mr. Wolf in the September 4, 2003 edition of *The Los Angeles Times.* This article, along with a contemporaneous article in *The New York Times Magazine,* indicated that discussions had taken place between NBC and Universal for a deal regarding the broadcast license rights for the three *Law & Order* series worth an estimated $1.6 billion over three years. In fact, when asked whether the number of $550 million per year was "in the ballpark," Mr. Wolf was quoted in *The New York Times Magazine* as describing that number as being at "the low end of the ballpark."

41.   Had Ms. Wolf been advised properly by Philpott, Weinberg, Assante, and Assante Business Management, and had they not concealed that the forensic accounting analysis relied on by Weinberg and Asante was prepared by a firm retained by Dick Wolf's divorce lawyer, and the biased and incomplete nature of that financial analysis, Ms. Wolf would have retained her own independent forensic accountant and valuation experts, and would have been fully and fairly advised of all assets of the marital estate, including, but not limited to, the actual and anticipated value of the *Law & Order* Franchise.

///

///

///

///

# FIRST CAUSE OF ACTION:

## BREACH OF FIDUCIARY DUTY/CONSTRUCTIVE FRAUD

### (Against All Defendants)

42.   Ms. Wolf incorporates the allegations in Paragraphs 1 through 41 set forth above as if each were set forth fully herein.

43.   Defendants owed a fiduciary duty to Ms. Wolf. Philpott acted as business manager and CPA for Ms. Wolf and her husband from 1994 to 2003. Beginning in 1998, Assante also provided these services to Ms. Wolf and her husband. Philpott and Assante Business Management also acted as Ms. Wolf's business managers after her separation from her husband in 2002. On various occasions in 2001 and 2002, Philpott also discussed with Ms. Wolf the difficulties she was having in her marriage, including Mr. Wolf's substance abuse and infidelity, and her concern about the impact of his conduct on her children. In August and September 2002, Weinberg, individually and on behalf of Assante, solicited Ms. Wolf, and convinced her to agree that Weinberg and Assante should advise Ms. Wolf and her husband on a division of their marital property, because Weinberg and Assante were purportedly well-suited to undertake this task, given Weinberg's experience and expertise and Assante's familiarity with the Wolfs' assets.

44.   As Ms. Wolf's business managers and CPA, Philpott, and Assante Business Management owed a fiduciary duty to her. Moreover, based on Philpott's and Assante Business Management's expertise and the relationship they had with Ms. Wolf, Ms. Wolf trusted Philpott and Assante Business Management to assume control over, and manage, her financial interests, and these Defendants voluntarily accepted her confidence with the implicit knowledge that she did not have expertise in these areas, and the understanding that she very much wanted to be liberated from her marriage. There thus arose a special confidential relationship between Ms. Wolf on the one hand, and Philpott and Assante Business Management on the other, under which these Defendants owed a fiduciary or other heightened duty of care to Ms. Wolf.

45.     Assante and Weinberg assumed a fiduciary duty to and/or initiated a special confidential relationship with Ms. Wolf when they undertook to counsel her respecting the marital property settlement. Ms. Wolf trusted Assante and Weinberg to be diligent in their investigation of the Wolfs' marital assets, particularly Mr. Wolf's future revenues from the continued exploitation of the *Law & Order* Franchise, to disclose to her fully the results of that investigation, and to be fair and to remain neutral when they offered to advise her and her husband and propose terms for the division or allocation of the Wolf's marital property. These Defendants voluntarily accepted and assumed this confidence, understanding that Ms. Wolf was relying on them and their expertise to assist her in the disposition of the Wolfs' marital assets, because she did not have the required expertise on her own. As a result, there arose a special relationship between Ms. Wolf and these Defendants.

46.     Defendants breached this fiduciary duty in several ways. First, they failed to maintain neutrality when advising Ms. Wolf, and while proposing terms for the division and allocations of the Wolfs' marital estate. Specifically Defendants, working in concert, willfully concealed from Plaintiff:

(a)     that Philpott, instead of providing Weinberg with Philpott's own work product, provided Weinberg with financial analyses prepared by CMM, the forensic accounting firm retained by Mr. Wolf's divorce lawyer;

(b)     that the CMM analyses failed to attribute any value to significant assets of the marital estate, including but not limited to the *Law & Order* Franchise and the future income to be generated by that franchise (other than as expressly contracted for by Mr. Wolf in 2001);

(c)     that the forensic accounting analysis relied on by Weinberg was prepared by the forensic accounting firm retained by Mr. Wolf's divorce lawyer;

(d)     that Weinberg sought and received comments on his proposed "term sheet" from Philpott, Mr. Wolf's divorce lawyer, and from Cliff Gilbert-Lurie, Mr. Wolf's transactional entertainment lawyer, and allowed Joseph Kibre, Mr. Wolf's divorce lawyer, to

1  rewrite the "term sheet," before Weinberg presented the "term sheet" to Plaintiff and

2  represented it to be his own work; and

3         (e)    that Defendants were knowingly favoring one client over another for

4  their own benefit when taking all the above actions.

5         47.    Second, Defendants, who knew or should have known that significant income

6  would be generated in the future by assets of the marital estate that were not accounted for at

7  all, or not accounted for properly, by the CMM analysis, including, but not limited to the *Law*

8  *& Order* Franchise, failed to advise Plaintiff that she needed to retain her own independent

9  forensic accountant and valuation expert. Third, Defendants failed to investigate adequately

10  the components and value of the Wolfs' community estate.

11         48.    Defendants' breach of their fiduciary duties also constitutes constructive fraud

12  under California law. Defendants' constructive fraud caused Ms. Wolf to suffer substantial

13  economic damages. As a result of the Defendants' breach of their fiduciary duties to Plaintiff,

14  Ms. Wolf signed an MOA and an MSA that omitted material financial terms, and which were

15  entirely contrary to her financial interests. The MOA and the MSA excluded Ms. Wolf's

16  share of the substantial revenues from the community estate of which Ms. Wolf would have

17  been aware about had Defendants adequately investigated the marital estate, advised her of

18  the need for her to retain her own independent experts to do so, or advised her that the

19  purported neutral recommendations made by Weinberg were based on a forensic accounting

20  analysis prepared by a firm retained by Mr. Wolf's divorce lawyer, in turn retained to

21  represent Mr. Wolf.

22         49.    As the direct and proximate result of the conduct hereinabove alleged, Ms. Wolf

23  has suffered damages in an amount exceeding the jurisdictional minimum of this Court, the

24  exact amount of which will be determined according to proof at trial.

25         50.    In addition to compensatory damages, Ms. Wolf is also entitled to punitive

26  damages according to proof of Defendants' financial status, because Defendants' conduct was

27  malicious, oppressive, and fraudulent.

28

# SECOND CAUSE OF ACTION:

## FRAUD

### (Against All Defendants)

51.     Ms. Wolf incorporates the allegations in Paragraphs 1 through 50 set forth above as if each were set forth fully herein.

52.     Defendants Philpott, Weinberg, Assante, and Assante Business Management committed numerous acts of fraud. Defendants were Ms. Wolf's fiduciaries, and willfully concealed at least the following material facts from Plaintiff:

(a)     that Philpott, instead of providing Weinberg with Philpott's own work product, instead provided Weinberg with financial analyses prepared by CMM, the forensic accounting firm retained by Mr. Wolf's divorce lawyer;

(b)     that the CMM analyses failed to attribute any value to significant assets of the marital estate or to the future income to be generated by those assets including, but not limited to the *Law & Order* Franchise (other than as expressly contracted for by Mr. Wolf in 2001);

(c)     that the analysis relied on by Weinberg was prepared by the forensic accounting firm retained by Mr. Wolf's divorce lawyer;

(d)     that Weinberg sought and received comments on his proposed "term sheet" from Philpott, Mr. Wolf's divorce lawyer, and from Mr. Wolf's transactional entertainment lawyer, and allowed Mr. Wolf's divorce lawyer to rewrite the "term sheet," before Weinberg presented the "term sheet" to Plaintiff and represented it to be his own work; and

(e)     that, in so doing, Weinberg and Philpott were conspiring against her in order to maintain and enhance their relationship with their preferred client and golden goose, Mr. Wolf.

53.     Weinberg proffered to Ms. Wolf a fraudulent "term sheet" in November 2002. At the time of its proffer, and throughout the process of purporting to advise her comprehensively about the Wolfs' financial condition, Weinberg assured Ms. Wolf, directly or

1   through her counsel, Mr. Beslow, that the "term sheet" was based on an objective, informed,

2   thorough and accurate assessment of the couple's finances performed by him and Assante.

3   The "term sheet" formed the basis for the parties' subsequent discussions during the process of

4   the division of the assets of their marital community. During these discussions, Weinberg

5   continued to reassure Ms. Wolf, directly or through her counsel Beslow, that the "term sheet"

6   was based on an objective, accurate, thorough, and reliable assessment of the couple's

7   finances.

8       54.    Weinberg knew that these misrepresentations of material facts were false at the

9   time they were made, because he knew that the "term sheet" was based not on his or Assante's

10  own neutral analysis but, rather, on the CMM analyses, and on the input of Mr. Wolf's

11  divorce lawyer and his transactional entertainment lawyer. The "term sheet" was not an

12  objective, informed, accurate, or reliable assessment performed by Weinberg or Assante;

13  rather, it was substantially the handiwork of Mr. Wolf's divorce lawyer and CMM, the

14  forensic accounting firm hired by Mr. Wolf's divorce attorney to represent the interests of Mr.

15  Wolf.

16      55.    In their role as financial advisors and business managers, and in their role as

17  purportedly neutral counselors respecting the division of the Wolfs' marital property, Philpott,

18  Weinberg, Assante, and Assante Business Management had a duty to investigate and disclose

19  all relevant information to Ms. Wolf, including all information that they knew or should have

20  known about the future income that would be generated, or that was likely to be generated, by

21  the assets of the marital estate. Defendants also had a duty to advise Ms. Wolf that, because

22  Weinberg's and Assante's analyses and recommendations were based on a forensic

23  accounting analysis done by Mr. Wolf's retained forensic accountant, she needed to retain her

24  own forensic accountant and/or valuation expert. The "term sheet" that Weinberg presented

25  to Ms. Wolf, and that formed the basis of the division of the marital property, failed to take

26  into account material information regarding the community assets and future income arising

27  from those assets. Philpott, Weinberg, Assante, and Assante Business Management knew or

28  should have known of these failures, yet they failed to inform Ms. Wolf of them. In fact, they

---

21

1  affirmatively and repeatedly assured Ms. Wolf, directly or through her counsel, Mr. Beslow

2  that they had investigated and reviewed all of the relevant financial information regarding the

3  community estate.

4      56.    During the period November, 2002 through January, 2003, Weinberg

5  represented repeatedly to Mr. Beslow the following important facts: (1) that as part of

6  Assante's due diligence in support of their representations regarding projected revenues for

7  Mr. Wolf and Wolf Films, Weinberg and Assante had analyzed the projected income of Mr.

8  Wolf and Wolf Films, Inc. through the term of Mr. Wolf's 2001 Overall Term Deal with

9  Studios USA (i.e., through August 31, 2006); (2) that Mr. Wolf had negotiated for a $50

10  million payment under that deal, $42 million of which he already had been paid, and $8

11  million of which remained to be paid; (3) that Weinberg's and Assante's projections

12  established that, during the term of the 2001 Overall Term Deal, Mr. Wolf was going to be

13  paid nothing more than the $50 million; (4) that there was no possibility within the

14  foreseeable future that Mr. Wolf or Wolf Films would be paid a major amount of money

15  beyond the $50 million; (5) that Assante was attributing zero value to Mr. Wolf's future

16  income during the term of the 2001 Overall Term Deal beyond the $50 million, because the

17  $50 million took into account all income to be earned by Mr. Wolf during that period; (6) that

18  Ms. Wolf and Mr. Beslow should not even think of retaining their own independent experts to

19  value Mr. Wolf's or Wolf Films' future income, because doing so would propel Ms. Wolf into

20  years of nightmarish litigation with Mr. Wolf during which Mr. Wolf would ruin Ms. Wolf's

21  life and refuse to see their children; (7) that Ms. Wolf had promised going into the process

22  that she would not retain outside experts to prepare a financial analysis of the marital estate,

23  and that doing so would be a breach of her agreement with Weinberg; and (8) that it would be

24  pointless for Ms. Wolf to thrust herself into nightmarish litigation adverse to Mr. Wolf in the

25  hopes of recovering something beyond her share of the $50 million, because she would be

26  fighting for something that did not exist.

27      57.    Plaintiff is informed and believes, and thereon alleges, that at the time Weinberg

28  made the foregoing representations, neither Weinberg nor Assante had done the work

1   necessary to evaluate the value of the *Law & Order* Franchise, or the income to be generated
2   by that franchise, and accordingly, that the foregoing representations were false, and were
3   made without any basis for believing them to be true. Plaintiff is further informed and
4   believes that Weinberg knew or should have known that, during the term of the 2001 Overall
5   Term Deal, Mr. Wolf, in fact, was likely to earn considerably more than the $50 million.

6       58.    Plaintiff is informed and believes and thereon alleges that Defendants Philpott,
7   Weinberg, Assante and Assante Business Management intended that Ms. Wolf rely on the
8   false representations made to her, and/or the concealment of material facts hidden from her.
9   Ms. Wolf relied upon Philpott's, Weinberg's, Assante's, and Assante Business Management's
10  false representations and concealments to her detriment. Ms. Wolf s detrimental reliance was
11  justified. As noted above, Ms. Wolf signed an MOA and an MSA that omitted material
12  financial terms and was contrary to her financial interests. If Philpott, Weinberg, Assante,
13  and Assante Business Management had not made these misrepresentations of important facts
14  and/or concealed these material omissions, Ms. Wolf would not have signed the MOA or the
15  MSA, which deprived her of significant assets to which she was rightfully entitled.

16      59.    As the direct and proximate result of the conduct hereinabove alleged, Ms. Wolf
17  has suffered damages in an amount exceeding the jurisdictional minimum of this Court, the
18  exact amount of which will be determined according to proof at trial.

19      60.    In addition to compensatory damages, Ms. Wolf is also entitled to punitive
20  damages according to proof of Defendants' financial status on the ground that Defendants'
21  conduct was malicious, oppressive, and fraudulent.

22                       **THIRD CAUSE OF ACTION:**

23                   **NEGLIGENT MISREPRESENTATION**

24                          **(Against All Defendants)**

25      61.    Ms. Wolf incorporates the allegations in Paragraphs 1 through 60 set forth
26  above, as if each were set forth fully herein.

27      62.    In the alternative, Ms. Wolf alleges that Defendants Philpott, Weinberg,
28  Assante, and Assante Business Management made numerous negligent misrepresentations to

1    her that they had no reasonable grounds for believing were true when they made them. If

2    Philpott, Weinberg, Assante, and Assante Business Management did not have actual

3    knowledge of the falsity of their representations discussed above, then they could and should

4    have nonetheless discovered the falsity of these representations through the exercise of

5    reasonable care or competence. As stated above, Philpott, Weinberg, Assante, and Assante

6    Business Management had a duty to remain neutral, and to inform Ms. Wolf of all relevant

7    financial information. They also had a duty to use reasonable care to determine the

8    truthfulness of their communications to Ms. Wolf. They failed to do either.

9        63.    Plaintiff is informed and believes that Weinberg was negligent in making the

10   representations set forth in Paragraph 58 above, because he had not conducted, or caused to

11   be conducted, the thorough and complete analysis of the Wolfs' marital estate that would have

12   been necessary in order to make the representations he made to Ms. Wolf, directly or through

13   her counsel Mr. Beslow, regarding Mr. Wolf's anticipated income during the term of the 2001

14   Overall Term Deal.

15        64.    Plaintiff is further informed and believes that, in making these representations

16   to her, Weinberg intended that she rely on them. Plaintiff reasonably relied on these

17   representations to her detriment because she entered into a division of her and her husband's

18   marital property that deprived her of significant assets to which she was rightfully entitled,

19   and her reliance on Weinberg's representations was a substantial factor in causing her harm.

20        65.    As the direct and proximate result of the conduct hereinabove alleged, Ms. Wolf

21   has suffered damages in an amount exceeding the jurisdictional minimum of this Court, the

22   exact amount of which will be determined according to proof at trial.

23                           **FOURTH CAUSE OF ACTION:**

24                               **NEGLIGENCE**

25                          **(Against All Defendants)**

26        66.    Ms. Wolf incorporates the allegations in Paragraphs 1 through 65 set forth

27   above as if each were set forth fully herein.

28

67.   Defendants' actions also constitute negligence. Defendants knew or should have known that the assets of the marital estate would generate substantial future income that was not reflected in the CMM analyses, or the work or recommendations by Weinberg and Assante. As Ms. Wolf's business managers, Philpott and Assante owed Ms. Wolf a duty to use reasonable care in dealing with her financial affairs, and to conduct a thorough investigation of the assets of the Wolfs' community estate and their value, both current and prospective. These Defendants and Weinberg also owed Ms. Wolf a duty of reasonable care in connection with their financial advice and recommendations in connection with the division and allocation of the Wolf's marital property.

68.   Defendants breached this duty of care. They did not use reasonable care when advising Ms. Wolf and proposing terms for the division and allocation of the Wolf's marital property. They failed to remain neutral, and failed to use reasonable care in discovering and counseling her regarding the entirety of the Wolf's community estate and its value, and failed to use reasonable care in identifying and valuing the assets of the marital estate. They also failed to use reasonable care in advising Ms. Wolf of the need for her to retain her own independent experts.

69.   As a result of this breach, Ms. Wolf suffered substantial economic damages. As noted above, Ms. Wolf signed an MOA and an MSA that omitted to take into account significant community assets and future income from those assets and were contrary to her financial interests. But for the Defendants' breach of their duty of reasonable care, Ms. Wolf would not have signed the MOA or the MSA.

70.   As the direct and proximate result of the conduct hereinabove alleged, Ms. Wolf has suffered damages in an amount exceeding the jurisdictional minimum of this Court, the exact amount of which will be determined according to proof at trial.

///
///
///
///

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, FRAUD, et al.

1

2

3

**FIFTH CAUSE OF ACTION:**

**BREACH OF CONTRACT**

**(Against All Defendants)**

4    71.    Ms. Wolf incorporates the allegations in Paragraphs 1 through 70 set forth

5 above as if each were set forth fully herein.

6    72.    The conduct of Defendants described herein constitutes a breach of their

7 agreement with Ms. Wolf to prepare a detailed analysis of Mr. and Ms. Wolf's financial

8 condition and, based thereon, to prepare an objective and unbiased recommendation or "term

9 sheet" for a division and allocation of their marital property.

10    73.    Ms. Wolf, in agreeing to allow Weinberg and Assante to prepare a detailed

11 analysis of the Wolfs' financial condition and to prepare an objective and unbiased

12 recommendation or "term sheet" for the division of their marital assets, by accepting the

13 structure of Weinberg's recommendation in whole or in part, by limiting the role of her

14 attorney and not retaining a forensic accountant, and by entering into the MOA and the MSA,

15 performed all, or substantially all, of the significant obligations required of her by her contract

16 with Defendants.

17    74.    Weinberg and Assante failed to prepare the detailed analysis of the Wolfs'

18 financial condition or the objective and unbiased recommendation or "term sheet" for the

19 division of the Wolfs' marital property which they had promised to provide to Ms. Wolf.

20    75.    Ms. Wolf has suffered damages as a result of this breach by signing the MOA

21 and the MSA in reliance on Defendants' promises to perform the detailed financial analysis,

22 and to prepare an objective and unbiased "term sheet" based on that purported financial

23 analysis.

24    76.    As the direct and proximate result of the conduct hereinabove alleged, Ms. Wolf

25 has suffered damages in an amount exceeding the jurisdictional minimum of this Court, the

26 exact amount to be determined according to proof at trial.

27    ///

28    ///

## PRAYER

1.   Ms. Wolf seeks compensatory damages according to proof, including the amount of her rightful share of the substantial assets and/or revenues from the Wolfs' community estate that, but for Defendants' conduct, she would have been aware of, and would have received, plus punitive damages against Defendants for their intentional and malicious and fraudulent conduct as alleged herein, and any other damages resulting from the Defendants' actions.

2.   Ms. Wolf requests an order awarding costs of this suit.

3.   Ms. Wolf further requests such other and further relief as the Court finds just and proper.

## JURY TRIAL DEMAND

Ms. Wolf hereby demands a jury trial in this matter.

Dated: July 25, 2008

LAW OFFICES OF DENNIS HOLAHAN

By: _____
Dennis Holahan, Attorneys for Plaintiff
Christine Wolf

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, FRAUD, et al.

# EXHIBIT B

Case 2:08-cv-05037 5G-RC    Document 5    Filed 08/C   .008   Page 1 of 3

Dennis Holahan, Esq. (CSB: 057324)
dholahan@holahanlaw.com
LAW OFFICE OF DENNIS HOLAHAN
2049 Century Park East, Suite 3180
Los Angeles, California 90067
Tel:  (310) 286-3344
Attorneys for Plaintiff Christine Wolf

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTINE WOLF,<br><br>Plaintiff(s),<br><br>v.<br><br>LORING WARD INC. F/K/A ASSANTE BUSINESS MANAGEMENT INC., et al.,<br>Defendant(s). | CASE NUMBER<br>CV 08-05037 PSG (RCx)<br><br>NOTICE OF DISMISSAL PURSUANT RULE 41(a) or (c) F.R.Civ.P. |

PLEASE TAKE NOTICE: (*Check one*)

☒  This action is dismis ed by the Plaintif (s) in its entirety.

☐  The Counterclaim brought by Claimant(s) _____ is
dismissed by Claimant(s) in its entirety.

☐  The Cross-Claim brought by Claimants(s) _____ is
dismissed by the Claimant(s) in its entirety.

☐  The Third-party Claim brought by Claimant(s) _____ is
dismissed by the Claimant(s) in its entirety.

☐  **ONLY** Defendant(s) _____

_____

is/are dismissed from (*check one*) ☐ Complaint, ☐ Counterclaim, ☐ Cros -claim, ☐ Third-Party Claim
brought by _____

The dismissal is made pursuant to Rule 41(a) or (c) of the Federal Rules of Civil Procedure.

August 4, 2008
_____
Date

*Signature of Attorney/Party*
Dennis Holahan, Esq
LAW OFFICES OF DENNIS HOLAHAN
Attorneys for Plaintiff Christine Wolf

*NOTE: F.R.Civ.P. 41(a): This notice may be filed at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first oc urs.*

*F.R.Civ.P. 41(c): Counterclaims, cros -claims & third-party claims may be dismis ed before service of a responsive pleading or prior to the beginning of trial.*

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen and not a party to the within action. My business address is 2049 Century Park East, Suite 3180, Los Angeles, CA 90067.

On August 4, 2008 I served the foregoing document described as follows:

## NOTICE OF VOLUNTARY DISMISSAL

upon the interested parties who have appeared in this action by placing a true copy thereof, enclosed in a sealed envelope addressed as follows:

### SEE ATTACHED SERVICE LIST

___X___ **(BY MAIL)** I am readily familiar with LAW OFFICE OF DENNIS HOLAHAN'S practice for the collection and processing of correspondence for mailing with the United States Postal Service; such envelope will be deposited with the United States Postal Service on the date shown below in the ordinary course of business at the business address shown above; and such envelope was placed for collection and mailing on the date shown below according to LAW OFFICE OF DENNIS HOLAHAN'S ordinary business practices.

___X___ **(BY MESSENGER SERVICE)** I caused the document(s) described hereinabove to be hand-delivered to the office of the above named addressees.

_____ **(BY PERSONAL SERVICE)** I delivered such envelope by hand to the office of the addressee(s).

_____ **(VIA OVERNIGHT DELIVERY)** provided by Federal Express or United Postal Service (UPS) by placing a true copy thereof enclosed in a sealed envelope provided by the overnight delivery service, with delivery fees provided for, and depositing same in a the pickup box regularly maintained by that respective overnight delivery service.

_____ **(BY TELECOPIER)** I caused the above document(s) to be telecopied to the addressee(s) at the telecopier number(s) listed above.

_____ **(BY EMAIL)** I caused the above document(s) to be transmitted in PDF format to the parties at their email address(es) listed above.

_____ **(STATE COURT)** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

___X___ **(FEDERAL COURT)** I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED on August 4, 2008 at Los Angeles, California.

------S-----

Dennis Holahan

Document1

Case 2:08-cv-0503~ SG-RC    Document 5    Filed 08/0  2008    Page 3 of 3

# SERVICE LIST

Patricia Glaser, Esq.                                    Attorneys for Defendant Martin Weinberg
Joel N. Klevens, Esq.
Christensen Glaser Fink *et al.*, LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
***By Personal Service***

Michael Meeks, Esq.                                      Attorneys for Defendant Robert Philpott
Pepper Hamilton LLP
Suite 1200
4 Park Plaza
Irvine, CA 92614-5955
***By Mail***

Dale F. Kinsella, Esq.                                   Attorneys for Defendant Loring Ward, Inc.
Michael J. Kump, Esq.
Kristen L. Spanier, Esq.
Kinsella, Weitzman, Iser, Kump & Aldisert, LLP
***By Mail***